122 So.2d 680 (1960)
William K. HINTON et al.
v.
Joe BEYL et al.
No. 5082.
Court of Appeal of Louisiana, First Circuit.
June 29, 1960.
*681 Pittman & Matheny, Hammond, for appellants.
Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, for appellees.
Before ELLIS, LOTTINGER and LANDRY, JJ.
LANDRY, Judge ad hoc.
This case is the result of a collision between a truck and trailer owned and operated by defendant Joe Beyl and a station wagon owned and being driven by plaintiff William K. Hinton, the accident occurring when the overtaking and passing station wagon struck the truck which was in the process of executing a left turn. Plaintiff and his guest passenger wife, Christine S. Henderson, sued defendant Beyl and his liability insurer, Canal Insurance Company, to recover damages for personal injuries sustained in the accident and upon rejection of their respective demands by the lower court, prosecuted this appeal.
The accident in question occurred December 11, 1957, at approximately 11:45 A.M., at the entrance of the Madisonville Creosote Works situated approximately two miles west of Madisonville, St. Tammany Parish, Louisiana, on the south side of U. S. Highway 190. At the scene of the accident, the highway a two laned paved thoroughfare, runs in an easterly-westerly direction. Although the accident occurred in St. Tammany Parish, suit was instituted in Tangipahoa Parish, domicile of the defendant Beyl.
The only issue presented herein is the negligence vel non of defendant Beyl. Negligence of course, is a question of fact to be determined in the light of the circumstances attending each individual case.
Despite a marked divergence between the versions of the contesting parties concerning the manner in which the accident occurred, the parties are more or less in agreement that prior to the accident defendant *682 Beyl was driving a truck and trailer loaded with long poles or piling which he intended to deliver to the creosote works. It is also agreed that Beyl was traveling westerly along the highway in the right westbound lane at a speed of approximately 35 to 40 miles per hour followed by a second truck (similarly loaded) also belonging to Beyl and being driven by Beyl's employee, Clarence Prevost, who was trailing the Beyl truck at a distance of 200 to 300 feet and traveling at approximately the same rate of speed as Beyl. In the interest of brevity we shall hereinafter refer to the lead truck driven by Beyl as the Beyl truck and the second or following truck as the Prevost truck. It is further agreed that the station wagon, traveling in a westerly direction, came upon the trucks proceeding in the manner indicated but shortly before overtaking the Prevost truck, plaintiff's vehicle was itself passed by a new, red 1958 Model Lincoln automobile which latter vehicle passed both trucks without incident. After the red Lincoln passed the station wagon, plaintiff pulled into the left or passing lane and passed the Prevost truck without mishap. From this point on any similarity between the testimony of the opposing parties is purely coincidental.
In substance, plaintiff William K. Hinton testified he was traveling at a speed of approximately 50 miles per hour at the time he passed the Prevost truck. He frankly concedes he was keenly interested in the red Lincoln which had just passed his station wagon and that to a limited extent he was preoccupied with admiring the Lincoln automobile although he vigorously denies he was devoting his entire attention to such pursuit. He estimated the speed of both trucks at approximately 35-45 miles per hour and admits there was a distance of approximately 200 feet between these two vehicles. After passing the Prevost truck he pulled into the right westbound lane behind the Beyl truck to wait until the Lincoln passed Beyl. As the Lincoln began to pass the Beyl truck plaintiff then straddled the center line of the highway in order to look between the Beyl vehicle and the Lincoln to watch for oncoming traffic. Observing no traffic approaching from the opposite direction, he did not sound his horn but pulled into the left or passing lane and accelerated his speed to pass the Beyl truck. When he reached a point approximately 60 feet behind the Beyl truck, Beyl suddenly and unexpectedly turned sharply to his left without any signal whatsoever. Observing this unconventional action on the part of the truck driver, he then sounded his horn and pulled to his left partly onto the shoulder of the highway to attempt to pass to the left of the truck but, seeing such a maneuver was impossible, he then cut back sharply to his right in an effort to pass to the right or rear of the truck and trailer. His endeavor was unsuccessful and the front of his automobile collided with the rear of the trailer in the approximate center of the highway. According to Hinton, at the moment of impact, the truck was completely stopped, the tractor portion thereof was entirely off the highway and the trailer extended across the center line of the highway virtually blocking the entire roadway. Following the impact, Hinton examined the truck and found the window on the driver's side up. He also examined the wiring of the turn indicator light on the rear of the trailer and found it was not connected to the electrical system on the truck. He denied emphatically that Beyl's turn indicator was on or that Beyl gave a hand signal indicative of his intention to turn.
In general the testimony of Mrs. Hinton corroborates that of her husband. She stated her husband passed the Prevost truck behind the Lincoln, pulled into the right lane between the Beyl and Prevost trucks and waited until the Lincoln passed Beyl. Mr. Hinton then assumed the passing lane to go by the Beyl truck but suddenly applied his brakes whereupon she inquired, "What's the matter?" to which Hinton replied, "He's turning left." She estimated the speed of the vehicle in which she was traveling at *683 approximately 50 miles per hour. Upon first being interrogated concerning the speed of the Beyl truck she declined to give an estimate in miles per hour and responded that she considered the truck was traveling at a safe and reasonable rate of speed provided it did not intend to make a left turn. She ultimately "guessed" the truck was traveling at 35 to 45 miles per hour and reiterated her opinion it was traveling too fast to attempt a turn. She admitted plaintiff did not sound his horn until the truck commenced its turn. She observed no turn signal whatsoever. Following the accident, she likewise noted the window on the driver's side of the Beyl truck was closed or up.
Defendant Beyl testified he and Prevost were hauling identical loads of piling for delivery to the Madisonville Creosote Works. Earlier that morning he had supervised the loading of the trucks near Covington, Louisiana. The pilings were bound to the trailer with chains and instead of attaching the trailer to the truck by means of affixing the coupling pole of the trailer to the usual connecting mechanism on the truck, he had bound the load itself to the truck in an acceptable manner an explanation of which is immaterial to any issue herein involved. His trailer was equipped with an electrical "blinker light" or turn indicator on the rear thereof and before embarking on his journey he connected the wiring which operated the signal to the wiring system on the truck so that when the control switch was turned on from inside the cab a turn signal would simultaneously be given both overtaking and oncoming traffic inasmuch as the truck was equipped with similar devices installed on each front fender thereof. He was positive the load was placed on the trailer in such manner as not to conceal or obscure the aforesaid signal device. As he approached his destination (the creosote works) he was traveling westerly in his proper lane of travel at a speed of 35 to 40 miles per hour accompanied by Raymond Prevost, brother of his employee, Clarence Prevost. He was approximately 200 feet in the lead of the Prevost truck and although it was cold he rolled down the window on his side and, upon reaching a point between 150 and 200 feet distant from the entrance to the creosote works, placed his turn indicator in operation, extended his arm in a left turn signal, and slowed the speed of his truck preparatory to making his intended turn. He noted that the front signal was operating and hearing a horn sound behind him glanced to his rear and saw the Lincoln passing him at high speed. Following the passage of the red Lincoln, he looked in his rear view mirror and observing no traffic between his vehicle and the Prevost truck commenced a gradual turn into the driveway while some 20 feet east thereof and traveling a speed he estimated to be between 10 and 12 miles per hour. Just as the front wheels of the truck cleared the paved portion of the highway he felt the impact at the rear of the trailer. Following the impact, the truck traveled an additional distance of about 20 feet and when it came to rest the rear wheels of the trailer were slightly to the south of the center line of the highway. According to Beyl from the moment he placed his directional signals in operation and extended his arm out of the window of the truck he continued both signals without interruption until the moment of impact. He stated that when he looked in his rear view mirror after the Lincoln passed his truck, plaintiff's vehicle was not in sight and he felt it was safe to turn as the only vehicle then within the range of his vision was the Prevost truck. He did not hear Hinton sound his horn and neither was he aware that Hinton applied his brakes. Following the collision he noted the turn signal on the front of his truck was still in operation but he did not check the signal device on the rear of the trailer. He further stated he was familiar with the entrance to the plant and knew that the roadway leading into said establishment was only about 20 feet wide. The piling he was transporting were 30 feet in length and the overall length of the truck and trailer, as loaded and assembled, *684 was approximately 45 feet. Finally, he testified that because of the length of the truck and trailer a gradual turn was necessary and he could not have entered the plant by driving directly opposite the driveway and turning sharply at a right angle as contended by plaintiffs.
Beyl's testimony regarding the signals given was corroborated by both Raymond and Clarence Prevost. On this issue, Raymond Prevost testified he was a passenger in the Beyl truck. He stated Beyl had the window down on the driver's side which caused it to be rather cold in the truck since the weather was cold and raw. He saw Beyl extend his arm through the window and also noted that the front turn indicator was flashing a left turn signal. Like Beyl, he heard neither the sound of Hinton's horn nor the application of his brakes.
Clarence Prevost (driver of the truck which was following the Beyl truck) testified that he had formerly worked for Beyl as a part time truck driver but had not been in Beyl's employ for at least a year preceding the trial of this cause. He was following Beyl at a distance of 250 to 300 feet traveling at about the same speed as the lead truck. When Beyl reached a point estimated at approximately 300 feet distant from the entrance to the creosote plant, Beyl reduced his speed, turned on his direction indicator and extended his arm in a left turn signal. Prevost then gave identical signals and, looking in his rearview mirror, noted two vehicles approaching from the rear of his truck. The first of said vehicles, the red Lincoln, passed him at a speed in excess of 60 miles per hour. When his truck was about 250 feet from the entrance to the plant, he observed Beyl commencing his turn and seeing that plaintiff would pass his truck, began a futile attempt to attract plaintiff's attention to the danger by waving his arm. Plaintiff either did not see or disregarded his signal and continued in the left lane of travel until the collision occurred. Prevost stated positively that after plaintiff passed his truck, the station wagon remained continuously in the left or passing lane and at no time returned to the right westbound side of the highway. He did state, however, that a moment before the impact plaintiff apparently made a vain attempt to enter the right lane and pass behind the trailer. In the opinion of this witness, plaintiff had room to pass to the right of the trailer and could have avoided the accident.
The learned trial judge, for written reasons assigned, found the sole proximate cause of the accident to be the negligence of plaintiff Hinton in driving at an excessive rate of speed, failing to maintain a proper lookout and failing to keep his vehicle under proper control. She absolved defendant Beyl of any actionable negligence by concluding the Beyl truck was in the process of turning when plaintiff passed the Prevost truck and Beyl did not see and could not have seen plaintiff's station wagon because when Beyl started his turn the station wagon was behind the Prevost truck and after he began his turn plaintiff's vehicle was out of the range of his rearview mirror.
In contending that the learned trial court erred in concluding as above stated, industrious counsel for plaintiffs reminds us of the settled jurisprudence to the effect a left turn is one of the most dangerous maneuvers that can be undertaken by a motorist and that a motorist attempting a left turn is charged with a high degree of care. Esteemed counsel also directed our attention to that line of cases which establishes the rule that a left turning driver must ascertain before turning that the way is free of oncoming and overtaking traffic which will be interfered with by his intended action. We are also reminded of the principle that a motorist desiring to execute a turn shall yield the right of way to traffic from either direction and shall not attempt a turn until the way is clear and the turn can be made in safety. We are in complete agreement with all of the legal tenets above set forth but we are also *685 aware of that line of jurisprudence which holds a motorist is not prohibited from making a left turn if oncoming or overtaking traffic is sufficiently distant to permit completion of the turn prior to the oncoming or overtaking traffic reaching the turning point. The cases so holding also establish the principle that in judging the distance of the oncoming or overtaking traffic the motorist desiring to turn has a right to assume the approaching motorist is not only traveling at a lawful rate of speed but is also maintaining a proper lookout and has his vehicle under control.
On the issue under consideration we deem the following language appearing in Johnson v. Wilson, La.App., 97 So.2d 674, 678, particularly apposite:
"Louisiana statute provides as to the overtaking driver: `The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard to the speed of such vehicle and the traffic upon and condition of the highway,' LSA-R.S. 32.234, subd. A. A vehicle overtaking another `shall pass at a safe distance to the left thereof' and `shall give audible and sufficient warning of his intention before overtaking, passing or attempting to pass a vehicle proceeding in the same direction', LSA-R.S. 32:233, subds. A, B.
* * * * * *
"As we recently reiterated in Jenkins v. Fidelity & Cas. Co., La.App., 92 So. 2d 120, at page 123:
"`It is well settled in Louisiana that the operator of a motor vehicle who desires to make a left turn, carries the responsibility of being certain that the turn can be made without danger to normal overtaking or oncoming traffic, and he must yield the right of way to such vehicles.' (Italics ours.)"
In the Johnson case, supra, this court pointed out the three general classifications into which cases of this nature may be grouped and, in support of those situations wherein the left turning driver was held free of negligence in attempting such maneuver after having given proper signal and commenced such movement upon reasonable belief, following observation of oncoming and overtaking traffic, such turn could be made without unduly interfering with such oncoming or overtaking, traffic, cited the following cases: Delaune v. Crawford, La.App. 1 Cir., 39 So.2d 94; Chandler v. Sentell, La.App. 1 Cir., 35 So. 2d 260; Deffez v. Stephens, La.App. 1 Cir., 30 So.2d 154; Goynes v. St. Charles Dairy, Inc., La.App. 1 Cir., 197 So. 819; White v. American Employers Ins. Co., La.App. 1 Cir., 197 So. 803. See also Moncrieff v. Lacobie, La.App. 1 Cir., 89 So.2d 471; Moore v. Benson, La.App. 2 Cir., 68 So.2d 250; Sumrall v. Myles, La.App. 1 Cir., 51 So.2d 411; Russo v. Aucoin, La.App. 1 Cir., 7 So.2d 744; Weitkam v. Johnston, La. App. Orleans, 5 So.2d 582. Following citation of the foregoing authorities, we also held in the Johnson case, supra:
"We find the instant facts to be very similar to those in Delaune v. Crawford, La.App., 39 So.2d 94, decided by this court, where we held that the plaintiff's recovery was not barred, when his driver made (as here) a `slow turn' left and was struck from behind by an overtaking vehicle. The latter's driver's excessive speed, lack of lookout, and imprudent attempt to pass plaintiff's vehicle were held to be the sole proximate cause of the accident. In so holding, we observed (quoting from an earlier decision), 39 So.2d 100:
"`* * * While a motorist in making a left hand turn on a highway in the face of oncoming traffic is required to exercise great caution and see that such turn can be made in safety, such a rule does not prevent the motorist from making the left turn if the oncoming traffic is of a sufficient distance to permit the execution thereof prior to the reaching of the oncoming traffic *686 at the turning point. In judging whether or not such a left hand turn can be made in safety, a motorist has the right to assume that the oncoming traffic is traveling at a lawful speed and that the driver thereof is exercising a proper lookout and has the vehicle under proper control.'
* * * * * *
"We are unable to accede to appellants' forceful argument that the left-turning driver is always barred from recovery when he proceeds to attempt a left turn, despite the presence of other traffic upon the highway. The left-turning driver is required to yield the right of way to and prohibited from attempting his turn unless the way is clear fromnot all approaching traffic, howsoever distant, butonly approaching traffic `which will be unduly delayed' by his turn, LSA-R.S. 32:235, subd. A. `The turning driver, after a proper signal for a left turn and observing nothing that would indicate his signal is not being obeyed, is entitled to assume that other drivers will obey the law and exercise reasonable care. Where he gives a proper signal, he is not required to pull off the highway to the right and wait for a vehicle, travelling in the same direction, to pass,' 2 Blashfield, Automobile Law and Practice 477, Section 1171."
Applying the foregoing principles to the case at bar we find, as did the learned trial judge, that the instant case falls within that classification which absolves the left turning motorist of liability when the turn is attempted after proper signal and in the reasonable belief the maneuver may be safely executed without unduly impeding other traffic.
Notwithstanding the testimony of plaintiffs to the contrary, the evidence convinces us Beyl was traveling at a speed of approximately 10 to 12 miles per hour at the time of the impact. Beyl, Clarence Prevost and Raymond Prevost all so testified and on this point their testimony is corroborated to some extent by that of plaintiffs who, despite their allegations of excessive speed on the part of Beyl, testified the truck came to a stop at the point of impact. Surely, if, as contended by plaintiff, the truck was traveling at a speed sufficient to make the turn unsafe, the truck would not have stopped at the point of impact. Furthermore, the evidence of Beyl himself is to the effect the truck traveled only about 20 feet after being struck, which testimony is not indicative of excessive speed. Moreover, the testimony convinces us Beyl did not make a sudden, sharp turn but a gradual angling turn. In this connection the evidence adduced on behalf of defendants shows that the truck and trailer were approximately 45 feet in length whereas that of plaintiffs establishes the length of the piling alone at approximately 60 feet. We believe defendant's evidence is more nearly accurate on this score. We find it most unlikely that Beyl (who was admittedly familiar with the entrance to the plant and knew the driveway was only about 20 feet in width) would indulge in the almost suicidal act of driving such a ponderous vehicle at high speed directly opposite such a narrow entrance and cutting sharply therein as contended by plaintiffs. As did the trial court, we accept the testimony of Beyl that being familiar with the condition of the entrance he was, in fact, making a slow gradual turn into the plant.
At the time he commenced his turn, Beyl had every reason to believe the maneuver could be executed in safety without unduly impeding or interfering with any traffic proceeding at a lawful rate of speed within the range of his vision. He had looked ahead and determined the roadway was free of oncoming traffic. After his truck was passed by the Lincoln, he consulted his rearview mirror and observed that his own truck was the nearest following vehicle. At the time he glanced in his rearview mirror he did not and could not see plaintiff's station wagon because plaintiff was *687 then behind the Prevost truck. Under such circumstances, it was reasonable for him to assume the turn could be made without impeding the progress of any overtaking vehicle proceeding at lawful speed. The situation presented in his rearview mirror would have indicated to any reasonable individual that the nearest visible vehicle would not be delayed or impeded by his proposed action. Under such circumstances he was not required, under penalty of being held actionably negligent, to anticipate that an unseen motorist overtaking the nearest visible vehicle would do so at such speed as to make his turn dangerous to himself and such other motorist.
Plaintiff undoubtedly failed to timely observe the gradual turn being executed by the truck. Whether his failure in this regard resulted from his preoccupation in admiring the red Lincoln as contended by defendants, or from other causes, is immaterial to a decision in this case.
Counsel for plaintiffs places great reliance upon Anderson v. Brackin Motors, La.App., 95 So.2d 730, wherein a defendant executing a left turn was held responsible for an accident which occurred when his vehicle was struck by a motorist overtaking and passing a vehicle to the immediate rear of the defendant's automobile. A careful reading of the facts of the Anderson case, supra, readily discloses the factual situation therein involved does not even remotely resemble the case at bar. In the cited case the left turning vehicle was at the head of a line of cars the nearest of which was only 15 feet to the rear of defendant's vehicle. In the instant case, the vehicle nearest defendant Beyl was his own slow moving truck at least 200 feet distant from the point where he commenced his turn.
Although counsel for plaintiff has cited numerous other cases involving left turn accidents, we find none exactly in point with the case presently under consideration. For example, Blanchard v. Ashby Const. Co., La.App., 95 So.2d 670, was a case in which the left turning motorist was struck by an overtaking vehicle traveling immediately behind the turning vehicle and not by an overtaking motorist passing an intervening vehicle. In Methvin v. Roshto, La. App., 96 So.2d 383 defendant was held liable to plaintiff for injuries sustained when defendant attempted a left turn 70 feet in front of plaintiff's oncoming automobile.
For the reasons hereinabove assigned, the judgment of the lower court is affirmed at appellants' costs.
Affirmed.